IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. |
| | ) | |
| Plaintiff, | ) | JUDGE |
| | ) | |
| v. | ) | |
| | ) | |
| $15,803.00 IN U.S. CURRENCY, and | ) | |
| $10,011.00 IN U.S. CURRENCY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | **COMPLAINT IN FORFEITURE** |

NOW COMES Plaintiff, the United States of America, by Carol M. Skutnik, Acting

United States Attorney for the Northern District of Ohio, and Jason M. Katz, Assistant U.S.

Attorney, and files this Complaint in Forfeiture, alleging, in accordance with Supplemental Rule

G(2) of the Federal Rules of Civil Procedure, as follows:

## JURISDICTION AND INTRODUCTION

1.      This Court has subject matter jurisdiction over an action commenced by the

United States under 28 U.S.C. Section 1345, and over an action for forfeiture under 28 U.S.C.

Section 1355(a).  This Court also has jurisdiction over this particular action under 21 U.S.C.

Section 881(a)(6).

2.      This Court has *in rem* jurisdiction over the defendant currencies: (i) pursuant to

28 U.S.C. Section 1355(b)(1)(A) because acts giving rise to the forfeiture occurred in this

district; and (ii) pursuant to 28 U.S.C. Section 1355(b)(1)(B), incorporating 28 U.S.C. Section

1395, because the action accrued in this district.  This Court will have control over the defendant

currencies through service of an arrest warrant *in rem*, which the Department of Homeland

Security by Homeland Security Investigations (HSI) will execute upon the defendant currencies.

*See* Supplemental Rules G(3)(b) and G(3)(c).

3.  Venue is proper in this district: (i) pursuant to 28 U.S.C. Section 1355(b)(1)(A)

because acts giving rise to the forfeiture occurred in this district; and (ii) pursuant to 28 U.S.C.

Section 1395 because the action accrued in this district.

4.  On or about January 10, 2025, Defendant $15,803.00 in U.S. Currency was seized

from the person and carry-on bag of Lamarcus Lett (LAMARCUS) and Defendant $10,011.00 in

U.S. Currency was seized from the carry-on bag of Byron Lett (BYRON), LAMARCUS'

brother, while both were at Cleveland Hopkins International Airport, and the defendant

currencies are now in the custody of the federal government.

5.  Subsequent to the seizure, U.S. Customs and Border Protection's (CBP) Fines,

Penalties & Forfeiture Office (FP&F) commenced an administrative forfeiture proceeding

against the defendant currencies.  Claims to the defendant currencies were submitted by

LAMARCUS and BYRON in the administrative forfeiture proceeding, thereby requiring the

filing of this judicial forfeiture action.

6.  Defendant $15,803.00 in U.S. Currency and Defendant $10,011.00 in U.S.

Currency are subject to forfeiture to the United States under 21 U.S.C. Section 881(a)(6) in that

they constitute proceeds from illegal drug distribution activities, and/or were used – or were

intended to be used – in exchange for illegal controlled substances, and/or were used – or were

intended to be used – to facilitate illegal drug distribution activities.

## FORFEITURE

7.      On or about January 10, 2025, HSI Task Force Officers (TFOs) were conducting airport interdiction operations at Cleveland Hopkins International Airport when LAMARCUS and BYRON were observed while boarding United Airlines Flight UA2710 to Los Angeles.

8.      LAMARCUS had a black roller bag and a noticeable bulge in his front left sweatpants pocket. BYRON, who was traveling with LAMARCUS, had a backpack.

9.      TFO Gibbons approached the pair, identified himself as law enforcement, asked if they would speak with him, and they agreed. TFO Gibbons then spoke to them separately.

10.     LAMARCUS told TFO Gibbons that they were going to Los Angeles for a day to visit his uncle, who was then in the hospital, and his aunt.

11.     TFO Gibbons asked LAMARCUS if he was carrying large amounts of U.S. Currency, and LAMRACUS said he had $9,000.00 in his pants pocket. TFO Gibbons then asked LAMARCUS if he had any other U.S. Currency on him, and LAMARCUS said he had $8,000.00 in his roller bag. When TFO Gibbons asked LAMARCUS how much total currency he had with him, LAMARCUS then said $18,000.00.

12.     TFO Gibbons then asked BYRON where he was going. BYRON told TFO Gibbons that he was going to Los Angeles for a few days. BYRON said that he was traveling with LAMARCUS.

13.     TFO Gibbons asked BYRON if he was carrying large amounts of U.S. Currency, and BYRON said he was, but did not know how much. BYRON said the money was not his and that it was in his backpack.

14.     Both LAMARCUS and BYRON agreed to continue their respective conversations at the HSI interview room at the airport.

15.     There, TFO Gibbons and LAMARCUS spoke outside of BYRON's presence. LAMARCUS told TFO Gibbons that he had about $18,000.00 in his possession and BYRON had around $9,000.00 in his possession, but that amount could be as much as $14,000.00. LAMARCUS then took the money out of his pocket and placed it on the room's table, and he took the money from his roller bag and placed that on the table.  A consensual search of the roller bag revealed no additional U.S. Currency or any contraband.

16.     LAMARCUS told TFO Gibbons that LAMARCUS' father, Mark Lett, had purchased LAMARCUS' plane ticket three days prior.  LAMARCUS represented he was going to Los Angeles for two-to-three days (in contradiction of his prior statement where he said he was going to Los Angeles for one day).

17.     LAMARCUS told TFO Gibbons that he and his brother were going to Los Angeles to drop money off with his Aunt Marie to pay for his uncle's funeral.  LAMARCUS said his uncle's name was John Lett.  LAMARCUS estimated the cost of the funeral to be around $20,000.00.

18.     LAMARCUS said that the money that BYRON had was his (LAMARCUS'). LAMARCUS claimed that he had broken it up because he knew he could not carry that much money.  LAMARCUS then told TFO Gibbons that his father had given BYRON the money that BYRON was carrying.   His father had given BYRON the money when they had come to the airport.  LAMARCUS said that money that LAMARCUS was carrying was already in his possession and was his (LAMARCUS').  Later in the interview, LAMARCUS changed his story, now claiming that the money in his possession had been given to him by his father, Mark Lett.

19.     TFO Gibbons then spoke to BYRON outside of LAMARCUS' presence. BYRON said that his father, Mark Lett, had given LAMARCUS and him envelopes of cash

4

before they left his house to travel to the airport.  BYRON said he saw his father give the money to LAMARCUS.

20.     Speaking to LAMARCUS again, outside of BYRON's presence, LAMARCUS now claimed that he had obtained the money in his possession by removing it from a bank safe-deposit box.  LAMARCUS claimed that his stepmother, Diana Moss, had brought him and BYRON to the airport.  LAMARCUS then changed his story, saying now that his father was the one who had given him the money.  LAMARCUS claimed he had lied to TFO Gibbons because he did not deal with the police.

21.     LAMARCUS told TFO Gibbons that Mark Lett had asked BYRON, at the last minute, to take the trip to Los Angeles.  BYRON was asked because LAMARCUS was not supposed to fly with that much cash.  LAMARCUS said the money that he was carrying was his father's and was to pay for his (Mark Lett's) brother's funeral.  LAMARCUS said his return flight was already booked, with him leaving Los Angeles on Sunday morning.

22.     When LAMARCUS was asked about his employment, LAMARCUS said that he owns New Life Trucking, which has four trucks.  LAMARCUS said he makes about $300,000.00 a year and has no other form of employment.  LAMARCUS said the seed money for his trucking company came from an accident settlement.  LAMARCUS said he files taxes and is not registered with FINCEN.

23.     LAMARCUS gave permission for TFO Gibbons to search his phone.  TFO Gibbons saw pictures of marijuana on LAMARCUS' phone.  LAMARCUS claimed they were photographs that a friend had forwarded to LAMARCUS in an attempt to have LAMARCUS buy from him because LAMARCUS uses marijuana. During the search of LAMARCUS' phone, TFO Gibbons found no correspondence between LAMARCUS and his Los Angeles aunt (Aunt

5

Marie) or uncle (Uncle John Lett). LAMARCUS said there were no correspondence between him and them because all their communications went through his father.

24.  TFO Gibbons then spoke to BYRON outside of LAMARCUS' presence. BYRON said he planned to leave Los Angeles on January 12, 2025 (which is a Sunday). BYRON reiterated that he did not know how much money was in his backpack, but did know that there was about $300.00 in his wallet, which was his. BYRON took the money from the backpack and placed it on the room's table. A voluntary search of BYRON's backpack yielded no additional money or any contraband.

25.  BYRON said he was traveling to Los Angeles to visit his uncle, who was in the hospital and on life support. BYRON said his uncle's name was Mickey (which is a different name than given by LAMARCUS). BYRON said he did not know if his uncle was married or what his uncle's last name was. BYRON also said he did not know where he was going to stay while in Los Angeles, and did not know who had purchased his airfare, saying it could have been his father or his brother. BYRON said that a different brother was supposed to have gone to Los Angeles, but that brother could not get off work.

26.  BYRON said he was taking the money to Aunt Marie. BYRON admitted that he had not spoken to Aunt Marie and that there was no correspondence on his phone between him and Aunt Marie.

27.  BYRON said he is unemployed and goes to school at Youngstown State University. BYRON said he has no income, but did file taxes in 2023. BYRON said that the money was not his and that he is not registered with FINCEN.

6

28.    HSI seized a total of $15,803.00 in U.S. Currency and an iPhone from LAMARCUS.  HSI seized a total of $10,011.00 in U.S. Currency from BYRON.

29.    A canine trained to detect the odor of heroin, cocaine, methamphetamine, and marijuana sniffed each of the seized currencies and alerted to the presence of odor of controlled substances on both the monies seized from LAMARCUS and the monies seized from BYRON.

30.    HSI officers obtained a state search warrant for LAMARCUS' iPhone.  During a search of LAMARCUS' iPhone, investigators discovered multiple text messages in which LAMARCUS appears to offer marijuana for sale (*e.g.*, an individual asked "Should I bring u the money for the weed?"; to which LAMARCUS replied, "What you want?"; and another chain where an individual asked "you got some smoke can I get a ten bag"; to which LAMARCUS responded "yeah . . . .").  Also on the phone were pictures of bulk marijuana inside vacuum sealed bags, including one that had an icon inserted that proclaimed that "mad deals flying."

31.    A subsequent record check determined that BYRON was charged in *State of Ohio v. Byron R. Lett*, City of Campbell Municipal Court, Case No. CRA2300283 with Trafficking in Marijuana, a felony of the fourth degree; and in *State of Ohio v. Byron R. Lett*, City of Campbell Municipal Court, Case No. CRA2300284 with Trafficking in THC, a felony of the fifth degree. On August 18, 2023, these cases were dismissed as part of a multi-case plea agreement, wherein BYRON pled no contest to a reduced charge of Improper Handling of a Firearm, a misdemeanor of the first degree, after being charged with Improper Handling of a Firearm, a felony of the fourth degree (CRA2300281); pled no contest to a reduced charge of Criminal Mischief, a misdemeanor of the third degree, after being charged with Possession of Drugs, a misdemeanor of the first degree (CRB2300285A); and pled no contest to reduced charges of disorderly conduct, minor misdemeanors, after being charged with Possession of Drug Paraphernalia,

misdemeanors of the fourth degree (CRB2300285B and C), while also getting the dismissal of a charge of Carrying Concealed Weapon, a felony of the fourth degree (CRA2300282).

## CONCLUSION

By reason of the foregoing, Defendant $15,803.00 in U.S. Currency and Defendant $10,011.00 in U.S. Currency are subject to forfeiture to the United States under 21 U.S.C. § 881(a)(6) in that they constitute proceeds from illegal drug trafficking activities, and/or were used – or were intended to be used – in exchange for illegal controlled substances, and/or were used – or were intended to be used – to facilitate illegal drug trafficking activities.

WHEREFORE, plaintiff, the United States of America, requests that this Court enter judgment condemning the defendant currencies and forfeiting them to the United States, and providing that the defendant currencies be delivered into the custody of the United States for disposition according to law, and for such other relief as this Court may deem proper.

Respectfully submitted,

CAROL M. SKUTNIK
Acting United States Attorney
Northern District of Ohio

By:

Jason M. Katz (OH: 0076104)
Assistant United States Attorney
Carl B. Stokes U.S. Court House
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113
216.622.3844
Fax: 216.522.7499
Jason.Katz@usdoj.gov

8

**VERIFICATION**

STATE OF OHIO )
) SS.
COUNTY OF CUYAHOGA )

I, Jason M. Katz, under penalty of perjury, depose and say that I am an Assistant United States Attorney for the Northern District of Ohio, and the attorney for the plaintiff in the within entitled action.  The foregoing Complaint in Forfeiture is based upon information officially provided to me and, to my knowledge and belief, is true and correct.

Jason M. Katz (OH: 0076104)
Assistant United States Attorney

Sworn to and subscribed in my presence this 5th day of June, 2025.

Notary Public

DANIEL R. RANKE, Attorney At Law
Notary Public - State of Ohio
My commission has no expiration date.
Section 147.03 O. R. C.